# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6259 | **DATE** | 2/8/2002 |
| **CASE TITLE** | Young vs. CTA | | |

[In the following box (a) indicate the party filing the motion, e.g.. plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on Chicago Transit Authority's motion for summary judgment. Chicago Transit Authority's motion for summary judgment is granted and the cause is dismissed with prejudice.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

| | | |
|---|---|---|
| | SM | courtroom deputy's initials |

number of notices: 3

FEB 11 2002 date docketed

CM docketing deputy initials

2/8/2002 date mailed notice

SM mailing deputy initials

**Document Number**

27

Date/time received in central Clerk's Office



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CHRISTOPHER K. YOUNG,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 00 C 6259** |
| **v.** ) | |
| ) | **Magistrate Judge Ian H. Levin** |
| **CHICAGO TRANSIT AUTHORITY,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Christopher K. Young ("Plaintiff") seeks recovery in an Amended Complaint against Defendant Chicago Transit Authority ("CTA") for unlawful discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* and the American with Disabilities Act of 1990, 42 U.S.C. §12101 *et seq.* Before the Court is Defendant CTA's motion for summary judgment. For the reasons set forth below, the Court grants the motion for summary judgment.

## BACKGROUND FACTS

**I.    PLAINTIFF'S TERMINATION**

Plaintiff began working for the CTA as a part-time bus operator on November 6, 1997. Def.'s LR 56.1(a)(3) St. ¶ 2. Plaintiff was assigned to the CTA's North Park bus garage located at 3112 West Foster Avenue in Chicago, Illinois. *Id.* ¶ 3.

On December 4, 1999, Plaintiff was working bus run 249 which operated on Clark Street. Def.'s LR 56.1(a)(3) St. ¶ 22. Plaintiff's bus run began at approximately 8:31 p.m. on December 4th,

and ended at approximately 6:19 a.m. on December 5, 1999. *Id.* ¶ 23. At about 12:31 a.m. on December 5th, Plaintiff slipped on the wet pavement and injured his ankle as he attempted to board his bus. *Id.* ¶ 24. Plaintiff continued working and reported the incident to the manager on duty, Eileen Jensen, at the end of his shift. *Id.* ¶ 25. Plaintiff informed Ms. Jensen that he was okay and did not indicate that he had been injured. *Id.* ¶ 26. Plaintiff did not request medical attention at that time. *Id.*

On December 6, 1999, Plaintiff reported to work and informed Melvin Jackson, Bus System Transportation Manager, that his ankle was hurting and that he was unable to work. Def.'s LR 56.1(a)(3) St. ¶ 28. Mr. Jackson requested that Plaintiff complete several written reports regarding his injury. *Id.* ¶ 29. Plaintiff completed a Miscellaneous Incident Report and an Employee's Report of Injury on Duty wherein he reported that during his December 4, 1999 run 249 he exited his bus to perform an inspection and that at 12:31 a.m. on December 5, 1999, as he attempted to board his bus, he twisted his ankle. *Id.*

Because of his claim of injury, Mr. Jackson ordered Plaintiff to submit to drug and alcohol testing pursuant to the CTA's drug testing policies and procedures. Def.'s LR 56.1(a)(3) St. ¶ 32. Pursuant to the CTA's Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees (effective January 1, 1995)[1], the position of bus operator is a "safety-sensitive" position for purposes of CTA's drug testing policies and procedures. *Id.* ¶ 30; Ex. D. Furthermore, the CTA's Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees provides in pertinent part:

---

[1] Attachment G of the 1996-1999 CTA - Amalgamated Transit Union ("ATU") Collective Bargaining Agreement.

2

g. Non-FTA [Federal Trade Administration] testing:

Also separate from any FTA requirements, the Authority requires that all employees covered by this policy submit to a drug and alcohol test:

i. In the event of an accident or any other incident involving a possible claim of injury or property damage not otherwise covered by the regulations.

Ex. D, CTA Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees, p. 14-15.

Because Plaintiff did not object to taking a drug and alcohol test, Mr. Jackson notified the CTA's Control Center Manager and requested that a technician from SmithKline Beecham Clinical Laboratories be dispatched to the North Park garage to test Plaintiff.[2] Def.'s LR 56.1(a)(3) St. ¶ ¶ 33, 34. Plaintiff submitted to a breathalyzer and provided a urine sample to Ms. Violet McBride, a collection site technician for SmithKline Beecham Clinical Laboratories on December 6, 1999.[3] *Id.* ¶ 36. Subsequent to Plaintiff's testing, Ms. McBride took the specimen to SmithKline Beecham Clinic Laboratories for analysis. *Id.* ¶ 39. The results of the urinalysis proved positive for the presence of cocaine metabolites. *Id.* ¶ 40.

Plaintiff did not return to work until December 22, 1999. Def.'s LR 56.1(a)(3) St. ¶ 41. When Plaintiff reported for work that day, he had been signed out of the North Park bus garage sick

---

[2] The process followed at the CTA when a drug or alcohol test is to be conducted is as follows: (a) the employee informs his or her manager of injury; (b) the employee fills out an Employee's Report of Injury on Duty form; (3) the employee's manager calls the Control Center, which in turn contacts the drug testing lab with which the CTA has contracted, SmithKline Beecham Clinical Laboratories; and (d) SmithKline Beecham Laboratories sends a tester to the garage, who then administers the test to the employee. Def.'s LR 56.1(a)(3) St. ¶ 35.

[3] Ms. McBride alleges that she followed the collection procedure proscribed in the CTA's Drug and Alcohol Policy Testing Program for Safety Sensitive Employees. Ex. D, p. 17-18.

Plaintiff, however, asserts that Ms. McBride did not follow proper collection procedures. Pl.'s LR 56.1(b)(3)(A) ¶ 37. For instance, the bottles were not sealed in Plaintiff's presence and a foreign substance was poured into his sample. *Id.*

book and was instructed to report to the CTA Medical Department by Mr. Walter Thomas, CTA's North Park Garage Manager. *Id.* Plaintiff reported to the CTA Medical Department where Dr. Irma Realiza, CTA's Medical Review Officer, informed Plaintiff that his urinalysis had tested positive for cocaine metabolites. *Id.* ¶ 42. During their meeting, the CTA relates that Plaintiff did not mention anything to Dr. Realiza regarding potential irregularities in the drug testing procedure.[4] *Id.* ¶ 43. Dr. Realiza then advised Ms. Cynthia Florence, Manager, Industrial Due Process, of Plaintiff's positive drug test and gave Ms. Florence copies of her written reports. *Id.* ¶ 44. Ms. Florence notified Plaintiff that he had violated the CTA Drug and Alcohol Policy and Testing Program for Safety-Sensitive Employees, other CTA rules, and that he was being suspended indefinitely. *Id.* ¶ 45. Plaintiff was instructed to report for further disposition regarding his suspension on January 6, 2000. *Id.*

On January 6, 2000, Plaintiff appeared pursuant to his Suspension Notification for an interview with Ms. Florence regarding his positive December 6, 1999 drug test. Def.'s LR 56.1(a)(3) St. ¶ 46. Plaintiff was represented by Local 241 Vice-President Lee Robinson who was also present at the interview. *Id.* At the interview, Ms. Florence asked Plaintiff to account for his positive test result. Florence Aff. ¶ 11. The CTA states that Plaintiff denied any drug use and told Ms. Florence that he had no problems with the collection and processing of his urine specimen.[5] *Id.* ¶ 48. Plaintiff acknowledged that he was aware of the CTA's policy regarding the use of drugs and alcohol. *Id.* ¶

---

[4]Plaintiff, however, alleges that he informed Dr. Realiza that there were irregularities in the drug testing procedure. Pl.'s LR 56.1(b)(3)(A) ¶ 43.

[5]Plaintiff, however, asserts that he informed Ms. Florence that he had a problem with the collection of his urine specimen, but that his concern was not written down. Pl.'s LR 56.1(b)(3)(A) ¶ 48.

47. Mr. Robinson indicated that since Plaintiff had denied any drug use, the union would make arrangements to have the split sample (specimen) tested.[6] *Id.* ¶ 50. A second interview was scheduled for February 2, 2000 in order to discuss the split sample test results. *Id.* ¶ 51.

On February 2, 2000, Plaintiff appeared before Ms. Florence for an interview, and again, he was accompanied by Mr. Robinson. Def.'s LR 56.1(a)(3) St. ¶ 52. Mr. Robinson verified that Plaintiff's split urine specimen had tested positive for cocaine metabolites. *Id.* ¶ 53. At the end of the February 2, 2000 interview, Ms. Florence informed Plaintiff that she was recommending him for discharge. *Id.* ¶ 55. Ms. Florence was recommending that Plaintiff be discharged because of his positive December 6, 1999 drug test and his ineligibility for the CTA's Employee Assistance Program ("EAP").[7] *Id.* ¶ 57. Ms. Florence further recommended Plaintiff's discharge because he violated the following CTA rules: General Rules 7a, b, c (obedience to rules); 14a, e (personal

_____

[6]CTA Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees provides with regard to drug testing collection procedures that the collection site technician will split the original urine specimen so that part of the original specimen is contained in a primary specimen bottle and part in a second bottle. The original specimen part contained in the second, non-primary bottle is known as the split specimen. Ex. D, CTA Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees.

[7]Attachment H (Employee Assistance Program),1996-1999 CTA-ATU Collective Bargaining Agreement (pp. H-1-H-2) provides in pertinent part:

B.    Participation

2.    First Time Rule Violators. If an employee eligible to participate in EAP as defined in Section A, above, with five (5) or more years of service violates the Authority's rules concerning alcohol, drug or controlled substance abuse (i.e., a rule violator), he/she may seek and be granted admission to the EAP, subject to the following limitations:

*    *    *    *

A first time rule violator with less than five years of continuous service will be discharged on the basis of the rule violation alone.

conduct); 24 (use of best judgment); Executive Orders 89-08 and 89-20, Attachment H of the 1996-1999 CTA-ATU Collective Bargaining Agreement; and CTA/FTA Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees. *Id.* Finally, Ms. Florence instructed Plaintiff to meet with Mr. Robert Gierut, Vice-President, Employee Relations, for discharge consideration, informed Plaintiff that his discharge hearing was scheduled for February 10, 2000 at 9:00 a.m. and, according to the CTA, told Plaintiff that if he failed to report as instructed he discharged by mail.[8] *Id.* ¶ 55.

On February 10, 2000, Plaintiff's discharge hearing was held. Def.'s LR 56.1(a)(3) St. ¶ 58. Mr. Gierut and Mr. Robinson were present; however, Plaintiff did not report for the hearing. *Id.* ¶ ¶ 58, 59. Mr. Gierut considered Plaintiff's positive drug test as a bus operator a direct threat to the health and safety of CTA's passengers. *Id.* ¶ 60. Based upon Plaintiff's failure to report for the discharge hearing, his positive drug test and the fact that Plaintiff was not eligible for CTA's EAP, Mr. Gierut prepared a written Notice of Discharge for Plaintiff, which union executive Mr. Robinson also signed. *Id.* ¶ 61. Ms. Florence, subsequently, mailed the Notice of Discharge to Plaintiff at the home address he had previously provided to her. *Id.* ¶ 62.

## II.  PLAINTIFF'S DIABETES

Plaintiff is a Type II diabetic. Def.'s LR 56.1(a)(3) St. ¶ 5. Throughout Plaintiff's employment with the CTA, Plaintiff took oral hypoglycemic medication to control his Type II diabetes. *Id.* ¶ 9. In February, March, July, and September of 1999, Plaintiff provided the CTA's

---

[8]Plaintiff, however, alleges that he believed that he was discharged on February 2, 2000 and did not realize that he needed to appear at the hearing on February 10, 2000. Furthermore, no one informed him of the fact that he still needed to appear at the February 10, 2000 hearing. Pl.'s LR 56.1(b)(3)(A) ¶ 55.

Medical Department with notes from his personal physician, Dr. Pinakin Amin, indicating that Plaintiff could perform his duties as a bus operator and that he did not have any medical restrictions. *Id.* ¶ 12. Moreover, Plaintiff never made a medical request for an accommodation to the CTA's Medical Department or to the CTA's Americans with Disabilities Act ("ADA") Accommodation Committee. *Id.* ¶ 13. Furthermore, Plaintiff never submitted medical documentation to the CTA indicating that he had any type of medical restriction.[9] *Id.* ¶ 14.

## III. PLAINTIFF'S PART-TIME EMPLOYMENT

Pursuant to Section 3.6 of the 1996-1999 CTA-ATU Collective Bargaining Agreement, part-time bus operators are eligible to be considered for available full-time bus operator positions on a seniority basis (determined by "entered service date"). Def.'s LR 56.1(a)(3) St. ¶ 15. The CTA explains that it did not transition Plaintiff to full-time status during his employment because the CTA first had to transition other, more senior part-time employees who had earlier entered service dates than Plaintiff. *Id.* ¶ 19.[10] For example, on December 26, 1997 and January 9, 2000, the CTA transitioned fifty part-time operators (on each date) to full-time status who had entered service dates of no later than September 30, 1997 and October 16, 1997, respectively. *Id.* ¶¶ 16, 17. As of February 10, 2000, (Plaintiff's discharge date), no part-time bus operator who had been hired on or after November 6, 1997 (Plaintiff's entered service date) had been given the opportunity to transition to full-time employment. *Id.* ¶ 18. Furthermore, between January 1, 1998 and June 14, 2001, the

_____

[9]Plaintiff does assert that he did inform the CTA of his medical condition and was forced to sign the "sick book" until he was able to return to work. Pl.'s LR 56.1(b)(3)(A) ¶ 14.

[10]Plaintiff asserts that he was not transitioned to full-time bus operator because he was black and the CTA was making a concerted effort to promote more Caucasian operators. Pl.'s LR 56.1(b)(3)(A) ¶ 19.

CTA transitioned 998 part-time bus operators to full-time status. *Id.* ¶ 21. The breakdown of the employees who were transitioned is as follows: 871 African Americans, 95 Hispanic Americans, nine Asian Americans, 22 Caucasians, and one American Indian.[11] *Id.*

## LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party had produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *LINC v. Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and to draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also Linc*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the

---

[11]Between October 11, 1999 and February 10, 2000, the CTA did not transition any Caucasian part-time bus operators to full-time status at the North Park garage. Def.'s LR 56.1(a)(3) St. ¶ 20. Plaintiff, however, conclusorily asserts that he has personal information that Caucasian bus operators who started with him were transitioned even though he never obtained full-time status as a bus operator. Pl.'s LR 56.1(b)(3)(A) ¶ 20.

parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505 or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). "[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985), *citing, Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1218 (7th Cir. 1980). Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Freeman v. Madison Metro. Sch. Dist.*, 2000 WL 1640952, *3 (7th Cir. Nov. 2, 2000) (*quoting Anderson*, 477 U.S. at 255, 106 S.Ct. 2505).

## ANALYSIS

## I.     TITLE VII DISCRIMINATION CLAIM

Plaintiff initially contends that the CTA unlawfully discriminated against him on the basis of his race by (1) unfairly and improperly drug testing him while other similarly situated non-black employees were not drug tested; (2) discharging him after improperly drug testing him and allegedly determining the existence of drugs; (3) subjecting him to differing terms and conditions of employment by failing to promote him to full-time employment after several years even though other similarly situated non-black employees were promoted; and (4) conspiring against him with respect

to his drug test. *See generally,* Am. Compl.; Pl.'s Mem.; & Pl.'s Dep. The CTA, on the other hand, argues that Plaintiff has failed to present any evidence of race-based discrimination. *See generally,* Def.'s Mem. & Reply.

Under Title VII, it shall be unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race . . . " 42 U.S.C. § 2000e-2(a)(1). "The central question in any employment-discrimination case is whether the employer would have taken the same action had the employee been of a different race . . . and everything else had remained the same." *Carson v. Bethlehem Corp.,* 82 F.3d 157, 158 (7th Cir. 1996) (per curiam).

To prevail in an employment discrimination suit brought under Title VII, a plaintiff must show that the defendant had an intent to discriminate; such a showing may be made directly, or indirectly, through use of an inferential burden-shifting method. *Kormoczy v. Secretary, United States Dep't of HUD,* 53 F.3d 821, 823-24 (7th Cir. 1995). The direct method requires that a plaintiff present either direct or circumstantial evidence of discriminatory intent. *Wallace v. SMC Pneumatics,* 103 F.3d 1394, 1397 (7th Cir. 1997).

In the absence of direct or circumstantial evidence of discriminatory intent, a plaintiff may show discriminatory intent indirectly using a burden-shifting method. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to use the burden-shifting method, a plaintiff must first establish a prima facie case of employment discrimination. *See Holland v. Jefferson Nat'l Life Ins. Co.,* 883 F.2d 1307, 1313 (7th Cir. 1989). Under the *McDonnell Douglas* framework, a plaintiff establishes a prima facie case of employment discrimination by showing by a preponderance of evidence that: (1) he is a member of a protected

class; (2) he was qualified for the job in question or was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action (e.g., termination); and (4) the employer treated similarly situated employees outside the protected class more favorably. *Foster v. Arthur Anderson, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999); *see Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. 1998).

If the plaintiff successfully makes the required prima facie showing, there's a presumption that the plaintiff was discriminated against, and the defendant then has the burden of showing that the decision that was made regarding the plaintiff's employment, was not, in fact, based on a discriminatory reason. *McDonnell Douglas*, 411 U.S. at 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668. The defendant must, therefore, articulate a legitimate, non-discriminatory reason for its decision. *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999). The employer must produce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742 (1993).

The burden then shifts back to the plaintiff "to present evidence that [the employer's] proffered reason is pretextual." *Vakharia*, 190 F.3d at 806-07. "Pretext . . . means a lie, specifically a phony reason for some action." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir. 1997). The plaintiff need only "produce evidence from which a rational factfinder could infer that the [defendant] lied about its proffered reasons . . ." *Weisbrot v. Medical College of Wis.*, 79 F.3d 677, 682 (7th Cir. 1996). The following examples could be introduced as evidence of pretext: "(1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the [adverse decision]; or (3) the proffered reasons were insufficient to motivate the [adverse

decision]." *Wolf v. Buss, Inc.*, 77 F.3d 914, 919 (7th Cir. 1996).

### A. There Were No Non-Black Individuals Who Were Injured On The Job Who Were Not Subject to a Drug Test.

Plaintiff concedes that he has no direct evidence of race discrimination and that he must proceed via the indirect *McDonnell Douglas* method. Plaintiff claims that he can establish a prima facie case of employment discrimination in violation of Title VII, in that, he was improperly drug tested and wrongfully terminated from the CTA after he tested positive for cocaine metabolites. Pl.'s Mem. at 4. Plaintiff alleges that (1) he is a member of a protected class because he is African American, (2) he was meeting the CTA's legitimate performance expectations; (3) he suffered an adverse employment action when he was terminated from his part-time bus operator position; and (4) that the CTA treated similarly-situated employees outside of his protected class more favorably. *Foster*, 168 F.3d. at 1035; *Bragg*, 164 F.3d at 376; Pl.'s Mem. at 4. Plaintiff, therefore, contends that he was treated differently because was black and that other non-black employees were not subjected to the same drug testing and, subsequent, termination. Pl.'s Mem. at 4; Pl.'s Dep. at 207.

The Court finds, however, that the record demonstrates that Plaintiff cannot establish a prima facie case of discrimination with respect to his described race discrimination claim. In preface, the Court notes that the CTA's Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees provides for drug testing of employees in the following specified circumstance applicable here: "In the event of an accident, or any other incident involving a possible claim of injury . . . " *Id.* Ex. D, p.14-15. Pursuant to the CTA's drug testing policies and procedures (which are based on the requirements of the Federal Transit Administration), the CTA ordered Plaintiff to submit to a drug test because he held a "safety-sensitive" position and because of his claim of injury on the job.

12

Def.'s LR 56.1(a)(3) St. ¶ 32. Plaintiff ultimately tested positive for cocaine metabolites. *Id.* ¶ 40.

Pursuant to the 1996-1999 CTA-ATU Collective Bargaining Agreement, "[a] first time rule violator with less than five years of continuous service will be discharged on the basis of the rule violation alone." Ex. D. Because Plaintiff was a first time rule violator and did not have five years of continuous service, he was subject to being discharged. Ms. Florence, CTA's Manager, Industrial Due Process, recommended that Plaintiff be discharged because of his positive drug test and informed Plaintiff that he was ineligible for the CTA's Employee Assistance Program. Def.'s LR 56.1(a)(3) ¶ 57. The Court, therefore, finds that Plaintiff has presented no evidence that the CTA failed to follow its drug testing and policy procedures, and moreover, applied them in a discriminatory manner with respect to Plaintiff. Accordingly, Plaintiff has failed to establish that he met the employer's legitimate performance expectations (necessary element (2)), when he tested positive for cocaine.[12]

Furthermore, even if *arguendo* it is assumed that Plaintiff has met the first three elements of a prima facie case of discrimination under the *McDonnell Douglas* framework, Plaintiff has failed to establish the fourth *McDonnell Douglas* element; namely, that the CTA treated similarly-situated individuals outside Plaintiff's protected class more favorably. As the record evidence in the case demonstrates, Plaintiff has presented no evidence that other non-black employees who were slightly

---

[12]In addition, requiring that Plaintiff submit to a drug test was not an adverse employment action. In *Stockett v. Muncie Indiana Transit Sys.*, 221 F.3d 997 (7th Cir. 2000), an employee bus driver brought a discrimination claim against his employer for improperly drug testing him which he alleged to be an adverse employment action that violated his rights under Title VII. After noting that an adverse employment action is "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or alteration of job responsibilities," the court found that requiring the employee bus driver to submit to a drug test, pursuant to an established drug policy, did not constitute an adverse employment action. *Id.* at 1001 (*quoting Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).

injured on the job, such as him, were not subjected to drug tests. Pl.'s Dep. at 74-81. Rather, Plaintiff in his deposition, conclusorily asserts that other similarly situated non-black employees were not drug tested and, ultimately, terminated. Plaintiff asserted, too, that one non-black employee, a "David," allegedly had an accident but was not subsequently drug tested. Pl.'s Dep. at 78. Plaintiff, however, cannot establish the "similarly situated" element by such a generalized, conclusory assertion or by simply referring to an unidentified non-black individual named "David." *See, e.g., Campbell v. Dominick's Finer Foods, Inc.*, 85 F.Supp.2d 866, 872 (N.D. Ill. March 8, 2000).

Plaintiff cites *Collier v. Budd Co.*, 66 F.3d 886 (7th Cir. 1995) in support of his reliance on Plaintiff's deposition testimony. That case, however, is distinguishable. In fact, in *Collier*, the Court explicitly stated that Plaintiff "[m]ust support his allegations of pretext with 'materials of evidentiary quality.' *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995). Thus, the courts may only consider testimony that is based on personal knowledge and otherwise conforms with the rules of evidence. *Id.* at 68." *Id.* at 892, n.8. Applying those principles to the particular facts and context of the age discrimination case there before it, the *Collier* Court concluded that Plaintiff's deposition testimony met the above test(s) and "specifically addressed" the employer's proffered reasons for retaining two younger employees. Here, in contrast, Plaintiff's deposition testimony, upon review, does not qualify as "materials of evidentiary quality," is not sufficiently based on "personal knowledge" and does not otherwise conform with the rules of evidence. *See, e.g., Campbell v. Dominick's Finer Foods, Inc.*, 85 F.Supp.2d 866, 872 (N.D. Ill. 2000); *Ferguson v. Robert R. McCormick Tribune Found.*, 108 F.Supp.2d 1033, 1040 (N.D. Ill. 2000).

In view of the foregoing, the Court finds that Plaintiff has not established a prima facie case of discrimination under the *McDonnell Douglas* framework.

Alternatively, assuming *arguendo* that Plaintiff can establish a prima facie case of discrimination, Plaintiff would still need to prove that the CTA's proffered reasons for drug testing and terminating him were phony (a lie) and thus a pretext for discrimination. As the record indicates, the CTA terminated Plaintiff because he tested positive for cocaine metabolites and failed to attend his February 10, 2000 discharge hearing. Def.'s LR 56.1(a)(3) ¶¶ 40, 59. As the Court noted *supra* Plaintiff has presented no evidence that the CTA failed to follow its drug testing and policy procedures. Moreover, based on the record, there is no admissible evidence that any non-black individual who was injured on the job was not drug tested. Pl.'s Dep. at 74-81. Therefore, the Court finds that Plaintiff has not offered any evidence from which a trier of fact could reasonably conclude that the CTA's proffered reasons for drug testing and terminating Plaintiff were a pretext for discrimination.[13]

**B.     CTA's Seniority System Was Not Applied in a Discriminatory Manner.**

Plaintiff alleges also that he was not promoted based on his race in violation of Title VII and moreover, he was qualified for the promotion to full-time employment. Pl.'s Mem. at 2. Again, in order for Plaintiff to establish a prima facie case of discrimination in a failure to promote case, he must demonstrate that (1) he was a member of a protected group; (2) he applied for and was qualified for the position sought; (3) he was rejected for the position; and (4) those that were promoted had

_____

[13]Plaintiff alleges that his drug test was tainted and that he was not a drug user. Pl.'s Mem. at 6. Even assuming *arguendo* that the test was tainted, Plaintiff must show but he has not shown that the CTA's decisionmakers did not honestly believe that the test was positive and instead dismissed him because of racial bias. Plaintiff must show but he has not shown the reason is "a lie, specifically a phony reason for some action." *Wolf,* 77 F.3d at 919. Finally, a plaintiff cannot prevail if the employer "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." *Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 890 (7th Cir. 1997). And the Plaintiff, respectfully, has not, in any way, evidentiarily challenged the CTA's honest belief position herein.

similar or lesser qualifications for the job, or, in other words, they were not more qualified for the position. *Sample v. Aldi Inc.*, 61 F.3d 544, 548 (7th Cir. 1995).

As a threshold matter, the Court finds that Plaintiff has not established a prima facie case of discrimination with respect to his promotion claim.[14] The record clearly demonstrates that Plaintiff was not qualified to transition from part-time employment to full-time employment because he had not reached the seniority status entitling him to full-time employment. Def.'s LR 56.1(a)(3) St. ¶ 18. For example, as of February 10, 2000 (Plaintiff's discharge date), no part-time bus operator who had been hired on or after November 6, 1997 (Plaintiff's entered service date) had been given the opportunity to transition to full-time employment. *Id.*

The Court also notes that Plaintiff has again merely makes speculative, unsubstantiated allegations regarding his promotion claim and has offered no "materials of evidentiary quality" to support his claim that similarly situated non-black employees were promoted. Pl.'s Dep. at 28. As the record demonstrates, there were no Caucasian part-time bus operators at the North Park garage who were transitioned to full-time employment between October 10, 1999 and February 26, 2001. Def.'s LR 56.1(a)(3) St. ¶ 20. Furthermore, between January 1, 1998 and June 14, 2001, the CTA transitioned 998 part-time bus operators to full-time status. *Id.* ¶ 21. The breakdown of the employees who were transitioned during that period is a follows: 871 African Americans, 95 Hispanic Americans, nine Asian Americans, 22 Caucasians, and one American Indian. *Id.* Given that nearly 87 percent of those who were transitioned from part-time to full-time employment constituted African American employees, Plaintiff assertion that he was not promoted to full-time employment

---

[14]As stated, *supra*, Plaintiff is proceeding under the indirect *McDonnell Douglas* method as to this issue.

due to racial bias, therefore, is unavailing.

Moreover, the Court, finds that the CTA's decision not to promote Plaintiff to full-time employment was appropriately predicated on Section 3.6 of the 1996-1999 CTA-ATU Collective Bargaining Agreement stipulating that part-time bus operators are eligible to be considered for full-time bus operator positions on a seniority basis. Plaintiff was treated no differently than any other part-time bus operator similarly situated; namely, those part-time operators who were hired by the CTA on or after November 6, 1997. It is undisputed that as of February 10, 2000 (Plaintiff's discharge date), no part-time bus operators who had been hired on or after November 6, 1997 (Plaintiff's entered service date) had been afforded the opportunity for transition to full-time status. Accordingly, Plaintiff cannot establish a prima facie case of discrimination for failure to promote.

Assuming *arguendo* that Plaintiff can establish a prima facie case of discrimination for failing to promote him to a full-time bus operator, Plaintiff would still need to prove that the CTA's proffered reason for not promoting him was a pretext for discrimination. Plaintiff, however, has presented no evidence on this score. As the Court noted *supra*, the CTA followed the mandates of Section 3.6 of the 1996-1999 CTA-ATU Collective Bargaining Agreement stipulating that part-time bus operators are eligible to be considered for full-time bus operator positions on a seniority basis. Moreover, based on the record, there is no evidence that as of February 10, 2000 (Plaintiff's discharge date), any part-time bus operator who had been hired on or after November 6, 1997 (Plaintiff's entered service date) had been given the opportunity to transition to full-time employment. Def.'s LR 56.1(a)(3) St. ¶ 18.

**C.     There Is No Evidence of a Conspiracy Involving Plaintiff's Drug Test.**

Plaintiff argues that there was a conspiracy involving his drug test. Pl.'s Mem. at 6.

17

Specifically, Plaintiff alleges that Ms. McBride, the collection site technician from SmithKline Beecham Clinical Laboratories, did not follow proper collection procedures. Pl.'s LR 56.1(b)(3)(A) ¶ 37. Plaintiff contends that the bottles were not sealed in his presence and a foreign substance was poured into his sample. *Id.* Tellingly, however, Plaintiff alleges that only Ms. McBride and Ms. Jensen, the manager on duty, were present when he was subjected to his drug test, and he does not know whether Ms. Jensen saw the outside tester pour something into Plaintiff's urine sample. Pl.'s Dep. at 85, 97. Therefore, among other things, there is simply no evidence that any CTA management person involved in Plaintiff's discharge had any knowledge of the "alleged" adulteration and, as such, no evidence whatsoever of any conspiracy by the CTA involving Plaintiff's drug test exists in the record.[15]

---

[15] The Court notes that in Ms. McBride's sworn testimony she states that she followed the collection process prescribed in the CTA's Drug and Alcohol Policy Testing Program for Safety Sensitive Employees. McBride Aff. ¶ 5; Ex. D, pp. 17-18. Specifically, Ms. McBride verified that she used the following procedure:

> 1. Ms. McBride verified Plaintiff's identity through his CTA employee identification card;
> 2. Ms. McBride inspected the collection room before Plaintiff's specimen collection;
> 3. The collection room was secured before and restricted during the collection process;
> 4. Ms. McBride instructed Plaintiff to urinate into the collection cup, which he did in the private collection room;
> 5. Within four (4) minutes after Plaintiff entered the collection room Ms. McBride received Plaintiff's original specimen from here;
> 6. In the presence of Plaintiff, Ms. McBride split the original specimen, assuring that the primary specimen bottle contained thirty (30) ml. of urine and the second bottle at least fifteen (15) ml. of urine;
> 7. Ms. McBride visually inspected the specimen for any unusual color or sediment and determined the specimen's temperature,

(continued...)

## II. AMERICANS WITH DISABILITIES ACT CLAIM

Plaintiff in his Amended Complaint and deposition contended that the CTA discriminated against him in violation of the ADA. *See generally,* Am. Compl.; Pl.'s Mem.; & Pl.'s Dep. Accordingly, the CTA, in its summary judgment brief sets forth various arguments to defeat the Plaintiff's ADA claim(s), including that Plaintiff has provided no evidence with respect to his ADA allegations. Def.'s Mem. at 4-10. Significantly, for the most part, the Plaintiff's response brief herein is totally silent, and makes no argument whatsoever, respecting the CTA's summary judgment arguments as to Plaintiff's ADA claim(s).

The Americans With Disabilities Act ("ADA") prohibits an employer from discriminating

---

[15](...continued)
> which Ms. McBride read within four minutes of collection.
> 8. Ms. McBride gave back to Plaintiff the two bottles which he had then closed;
> 9. Ms. McBride recorded Plaintiff's temperature in the appropriate place on the custody and control form, and then completed and signed the custody and control form;
> 10. In Plaintiff's presence, Ms. McBride sealed both bottles and labeled them (with the same specimen identification number as the custody and control form.)
> 11. Once the labels were attached to the specimen bottles, Plaintiff initialed and dated the labels to verify that this was his specimen;
> 12. Both specimens were placed in a single shipping container (a plastic specimen bag),
>  with the appropriate pages of the custody and control form;
> 13. Plaintiff and Ms. McBride initialed and dated the shipping container (the plastic specimen bag;
> 14. Ms. McBride instructed Plaintiff to read and sign the custody and control form;
> 15. Plaintiff signed the custody and control form; and
> 16. Ms. McBride placed the specimen in secure storage (a collection kit case). Def.'s LR 56.1(a)(3) St. ¶ 37; McBride Aff. ¶ 5.

against a qualified individual with a disability. *See* 42 U.S.C. § 12112(a). Specifically, the ADA provides:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).[16]

The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In order to establish disability discrimination, a plaintiff must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation; and (3) he suffered an adverse employment decision because of his disability. *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 669-70 (7th Cir. 2000). Moreover, under the ADA, an individual is disabled if he (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2); *Bekker*, 229 F.3d at 670; *see also Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1059-60 (7th Cir. 2000). The Supreme Court has recently held that "substantially" in the phrase "substantially limits"

---

[16]"Reasonable accommodation" may include: job structuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9).

suggests "considerable" or "to a large degree" and that "major life activities" refers to "those activities that are of central importance to daily life." *Toyota Motor Manufacturing Kentucky, Inc. v. Williams,* 122 S.Ct. 681, 691 (2002).

Under the ADA, an employee has two methods for establishing that his employer discriminated against him based on his disability. *See Cheek v. Peabody Coal Co,* 97 F.3d 200, 203 (7th Cir. 1996). First, an employee "may present direct or circumstantial evidence that the employment decision was motivated by the employer's discriminatory animus." *Bellaver v. Quanex Corp.,* 200 F.3d 485, 492 (7th Cir. 2000); *see also DeLuca v. Winer Indus. Inc.,* 53 F.3d 793, 797 (7th Cir. 1995). Second, an employee may use the burden shifting method set forth in *McDonnell Douglas* to prove by indirect evidence that his employer intentionally discriminated against him. 411 U.S. at 802-805. *See Deluca,* 53 F.3d at 797.

**A.      Plaintiff Was Not Disabled and Did Not Provide The CTA with Medical Support for the Need for an Accommodation and The CTA Discharged Plaintiff Because He Tested Positive for Cocaine and Failed to Attend his Discipline Hearing.**

In his responsive brief herein, Plaintiff's only reference to his ADA claim is in his introduction, wherein Plaintiff conclusorily asserts that he was targeted for discharge because he had diabetes. Pl.'s Mem. at 2.

To abbreviate, then, the Court finds as a threshold matter that Plaintiff has failed to establish a prima facie case for discrimination under the ADA. *See, e.g Bekker v. Humana Health Plan, Inc.,* 229 F.3d 662, 669-70 (7th Cir. 2000).

Plaintiff has presented no evidence to support his allegation that he was disabled or that the CTA was aware of any limitation on his ability to work. Plaintiff failed to present evidence that his

Type II diabetes is disabling; namely, that Plaintiff's diabetic condition substantially limited any major life activity. *See, e.g. Toyota Motor Manufacturing Kentucky, Inc.,* 122 S.Ct. at 691. Plaintiff was a part-time CTA bus driver for over two years. Plaintiff never submitted medical documentation to the CTA indicating that he had any type of medical restriction concerning working hours or conditions, or that he needed any type of accommodation. Realiza Aff. ¶ 8. In fact, Plaintiff's own doctor, Dr. Pinakin Amin, provided the CTA's Medical Department with notes indicating that Plaintiff was fit to work his job without any medical restrictions. Realiza Aff. ¶ 7. Furthermore, although Plaintiff stated in a generalized, unspecified way that he asked them if he could work mornings, (Pl.'s Dep. at 83), Plaintiff never made an accommodation request to the CTA's ADA Accommodation Committee or to the CTA's Medical Department. Realiza Aff. ¶¶ 8, 9.

In short, the Court finds that the Plaintiff has failed to establish a prima facie case of disability discrimination. Even assuming *arguendo* that Plaintiff could establish a prima facie case of disability discrimination, the CTA has proffered a legitimate, nondiscriminatory reason for not providing Plaintiff with accommodations; namely, that he was not disabled and he never submitted medical documentation of an impairment or the need for an accommodation. In the face of this, the Plaintiff offered no evidence to meet his burden that the CTA's stated reasons were a "pretext" for disability discrimination.

Finally, as stated, Plaintiff conclusorily alleges that the CTA discriminated against him in violation of the ADA by terminating him on February 10, 2000. Pl.'s Mem. at 2.

However, as demonstrated by the record, the CTA terminated Plaintiff because he violated the CTA's rules and the CTA's Drug and Alcohol Policy and Testing Program for Safety Sensitive Employees by testing positive for cocaine metabolites and by failing to attend his discharge hearing. Def.'s LR 56.1(a)(3) ¶¶ 40, 61. Moreover, there simply is no evidence in the record and the record

clearly does not support a conclusion that Plaintiff was terminated as a result of the CTA's alleged discrimination against him based on his diabetes. Thus, Plaintiff has presented no direct or circumstantial evidence that the CTA had any other reason for terminating Plaintiff other than his positive drug test and failure to attend his hearing.

The Court, therefore, finds that the CTA is entitled to summary judgment on Plaintiff's above discussed ADA claims.

### B. Plaintiff Was Not Entitled to Full-Time Employment Based on the CTA's Seniority System.

Plaintiff claimed in his deposition that the CTA discriminated against him in violation of the ADA when he did not receive a promotion from a part-time bus operator to full-time bus operator. Pl.'s Dep. at 121. In order to prove that he was discriminated against based on his disability, Plaintiff must first show that he is disabled under the terms of the ADA.

First, as discussed *supra*, Plaintiff has failed to prove that he is disabled and he cannot establish a prima facie case of disability discrimination. In any event, the Court notes that there are no facts that support Plaintiff's allegation that the CTA failed to transition Plaintiff from part-time to full-time employment because of his diabetes. In fact, Section 3.6 of the 1996-1999 CTA-ATU Collective Bargaining Agreement stipulates that part-time bus operators are eligible to be considered for available full-time bus operator positions on a seniority basis (determined by an employee's "entered service date"). Def.'s LR 56.1(a)(3) ¶ 15. Therefore, based on the record there is no evidence that as of February 10, 2000 (Plaintiff's discharge date) that any part-time bus operator who had been hired on or after November 6, 1997 (Plaintiff's entered service date) had been given the opportunity to transition to full-time employment. *Id.* ¶ 18.

In sum, the record clearly does not support a conclusion that Plaintiff remained as part-time bus operator due to the CTA allegedly discriminating against him based on his diabetes.

## CONCLUSION[17]

Based on the foregoing, the CTA's motion for summary judgment is granted.

ENTER:

_____
IAN H. LEVIN
**United States Magistrate Judge**

**Dated: February 8, 2002**

---

[17]In view of the Court's ruling herein, the Court deems it unnecessary to reach the CTA's argument that Plaintiff's claims of failure to promote, failure to address racial concerns and failure to accommodate are not like or reasonably related to Plaintiff's EEOC charges.